UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>       v.<br><br>JANAMJOT SINGH SODHI,<br><br>              Defendant. | Case No.  1:11-cr-00332-JLT<br><br>ORDER DENYING MOTION FOR RECONSIDERATION<br><br>(Docs. 45, 47) |

Janamjot "Jimmy" Singh Sodhi filed a motion to set aside his plea because he claimed that his attorney failed to advise him of the immigration consequences that such a plea would invoke. The Court held an evidentiary hearing and determined that Mr. Sodhi's claim was false and that his attorney did, in fact, inform him of the dire immigration consequences the plea agreement posed.

At the evidentiary hearing, the Court precluded Mr. Sodhi from presenting evidence extraneous to the issue of whether the attorney advised Sodhi of the immigration consequences of this plea[1]. At that time, Mr. Sodhi wished to provide testimony from experts that the attorney should have sought a plea agreement that would not have posed immigration consequences to him. The Court noted that this claim was not raised in his motion. Rather, as repeatedly noted in

---

[1] By this time, however, evidence on this issue had already been presented because it had not become clear that the evidence was directed at claim that had not been plead.

1

1  motion for reconsideration (Doc. 104 at 3-4), in his motion he claimed that he had not been

2  advised of any immigration consequences <u>but if he had been informed</u>, he would have sought a

3  more favorable plea agreement that did not have immigration consequences. Because the Court

4  found that, in fact, Mr. Sodhi *had been informed,* impliedly the Court rejected as irrelevant what

5  he would have done otherwise.²

6  Mr. Sodhi now requests the Court reconsider it's ruling precluding the expert testimony or

7  to allow him to file an amended motion to state the claim that the attorney should have sought a

8  plea that would not have had any immigration consequences. For the reasons set forth below, the

9  motion is **DENIED.**

10  **I.    The motion did not claim that the attorney's representation was deficient**

11  ***except* as to the failure to advise of the immigration consequences of the plea.**

12  Mr. Sodhi filed his first motion to vacate his sentence on May 28, 2019. (Doc. 45) In that

13  motion brought under Federal Rules of Criminal Procedure 11(d)(20(B), he alleged that he

14  received ineffective assistance of counsel based upon his attorney's failure to advise him of the

15  immigration consequences of his plea. *Id.* at 2. Petitioner alleged,

16  > Petitioner entered a plea bargain in this Honorable Court on January 22, 2013, and
17  > was represented by Attorney Daniel Bacon **who failed to advise the petitioner of collateral immigration consequences** during the plea agreement process . . .

18  (Doc. 45 at 2, ¶ 3, emphasis added)

19  > Petitioner's plea agreement was not as a whole knowing, voluntarily and
     > intelligent waiver of his right to appeal or a jury trail [sic]; **since he was not
20   > advised of adverse immigration consequences** of mandatory deportation prior to
     > entering a plea, and thus, he received ineffective assistance of counsel.
21

22  *Id.* at 2 ¶ 4, emphasis added.

23  > Petitioner also contends he would not have accepted a plea agreement **had he been
     > made aware of the collateral immigration consequences**. If properly advised,
24  > the petitioner's decision making process would have been different.

25  *Id.* at 3 ¶ 6, emphasis added.

26  > Petitioner meets the requirements for setting aside or vacating a conviction for
    > constitutionally ineffective assistance of counsel . . . **considering the counsel's**

27  ---
    ² To be absolutely clear: the Court found Mr. Sodhi's testimony to be incredible. The Court found Mr.
28  Bacon's testimony to be credible and that his memory hampered by the passage of time and the fact that
    his notes were "lost" after the file went into Mr. Sodhi's possession.

> **failure to notify the immigrant of collateral consequences** of the plea agreement fell below an objective standard of reasonableness, and that he was prejudiced as a result of counsels [sic] error.

*Id*. at 3 ¶ 7, emphasis added.

> By **failing to advise the petitioner of the severe immigration consequences** of his plea agreement, the counsel failed to protect the Fifth and Sixth Amendment Rights of the petitioner.

*Id*. at 3 ¶ 10, emphasis added.

> Petitioner did not seek relief earlier because· his attorney assured him that as a legal permanent resident, who has been granted political asylum the petitioner **need not worry about being deportation** . . .

*Id*. at 3 ¶ 11, emphasis added.

> The previous plea agreement should be vacated as **petitioner was not adequately advised by counsel of the severe immigration consequences** . . .

*Id*. at 4 ¶ 13, emphasis added.

> The petitioner **was not advised of the potential collateral immigration consequences** before entering a plea agreement with the government; and therefore, he received ineffective assistance of counsel.

*Id*. at 12, emphasis added. The motion continued, "The petitioner **was not advised of the potential collateral immigration consequences** before entering a plea agreement with the government; and therefore, he received ineffective assistance of counsel." *Id*. at 8, emphasis added. The motion states further that if "**he had been informed or made aware that in entering a guilty plea he would be subsequently subjected to mandatory deportation**, he would not have entered into a plea and instead would have gone to trail [sic] or negotiated an alternative plea that would not have adverse immigration consequences." *Id*. at 9, emphasis added. The motion concludes, "Petitioner was not advised of collateral immigration consequences during his plea process in violation of his Sixth Amendment right to effective assistance of counsel." *Id*. Sodhi submitted a declaration along with the motion asserting these same facts. (Doc. 45 at 11-12)

After reviewing the motion, the Court notified petitioner that it intended to construe his motion as one brought under 28 USC § 2255 because Federal Rules of Criminal Procedure 11(d)(20(B) applied only when the motion is made before the court imposes sentence. (Doc. 46 at

3

1) The Court granted Sodhi the opportunity to withdraw the motion or to amend it "so that it contains all the § 2255 claims he believes he has." *Id*. at 2, 3. The Court warned Sodhi,

> . . . the Court now explicitly cautions Petitioner that should the Court re-characterize this motion as a § 2255 motion, any subsequent § 2255 motion Petitioner should wish to file in the future will be subject to the restrictions on "second or successive" motions under the Antiterrorism and Effective Death Penalty Act. *Castro*, 540 U.S. at 383. A § 2255 petitioner must present all grounds that he believes he has in one motion, because once the Court rules on that motion, a second motion may only be filed with the permission of the appropriate appellate court.

*Id*. at 2.

Consistent with the Court's order, on July 8, 2019, Sodhi submitted an amended motion. (Doc. 47) His amended motion was nearly identical to his original one. *Id*. at 2 ¶¶ 3, 4; *Id*. at 3 ¶¶ 6, 7; *Id*. at 4 ¶¶ 10, 11; *Id* at 5 ¶ 13; *Id.* at 12-13, 14, 15. He also submitted an affidavit in support of the new motion, which made the same assertions. *Id*. at 18-19. In neither his initial nor his amended motion did Sodhi allege—or even hint at—the alternative basis for relief he now urges.

Notably, in setting the matter for an evidentiary hearing, Judge Drozd noted and analyzed Sodhi's claim that Mr. Bacon failed to advise him of the immigration consequences of his plea. (Doc. 69 at 5-7) Judge Drozd analyzed *Strickland's*[3] "prejudice" element by relying upon Sodhi's assertion that he would not have entered into the plea agreement had he known of the "near-certain deportation that would follow the plea." *Id*. at 8. The Court recognized the dispute of fact as to whether Sodhi was informed of the immigration consequences of the plea. (Doc. 69 at 8)

Though recognizing that the government and the Court believed only that at issue was the credibility determination outlined in the Court's order (Doc. 69), Sodhi's counsel made no effort to seek to amend the motion. Sodhi suggests that the government was attempting to "limit the scope of [the] postconviction claim [ ] by cherry-picking what they choose to respond to and essentially ignoring the rest. That is patently wrong." (Doc. 104 at 3) Though the Court agrees that this would be wrong, it is equally wrong to suggest that the mere mention of ineffective assistance of counsel in the motion means that every aspect of the attorney's duty is at issue *despite that the pleading did not mention any other factual basis.* Though pro se pleadings are

---

[3] *Strickland v. Washington*, 466 U.S. 668, 688, 692 (1984).

4

1    held to a less stringent standard than those drafted by lawyers (*Haines v. Kerner*, 404 U.S. 519,

2    520 (1972)), "[i]t is well-settled that '[c]onclusory allegations which are not supported by a

3    statement of specific facts do not warrant habeas relief.'" *Jones v. Gomez*, 66 F.3d 199, 204 (9th

4    Cir. 1995) (quoting *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994)). *See also Corjasso v. Ayers*,

5    278 F.3d 874, 878 (9th Cir. 2002) ("Pro se habeas petitioners may not be held to the same

6    technical standards as litigants represented by counsel."); *Porter v. Ollison*, 620 F.3d 952, 958

7    (9th Cir. 2010) ("[T]he petitioner is not entitled to the benefit of every conceivable doubt; the

8    court is obligated to draw only reasonable factual inferences in the petitioner's favor.").

9          Unlike in the cases cited, Mr. Sodhi did not make conclusory allegations in his motion that

10   Mr. Bacon should have obtained a more favorable plea for him. Rather, he failed to even hint at

11   this claim in either his initial and amended motion. He plead no facts that would give rise to this

12   claim and never suggested that, even though he was advised of the immigration consequences of

13   the plea, that Mr. Bacon should have sought a plea agreement with no immigration consequences.

14   This failure to allege any facts suggesting that Mr. Bacon failed to seek a more favorable plea, is

15   particularly striking in light of the Court's explicit warning that he must raise every claim in the

16   motion. (Doc. 46)

17         At the status conferences in the period leading up to the evidentiary hearing, the Court

18   iterated and reiterated that the purpose of the hearing was to determine whether Sodhi was

19   advised of the immigration consequences of his plea.  (Doc. 101-4 at 43–44, 46–47.) Though

20   Sodhi's counsel disputed generally that an adverse credibility determination ended the analysis,

21   she discussed Mr. Sodhi's strategy only in vague terms. Indeed, the bulk of her reply here makes

22   clear that she *knew* that the government did not know the claim that Sodhi would press at the

23   evidentiary hearing and took efforts to keep it that way. (Doc. 104 at 1-2)

24         Despite the Court repeatedly stating that it intended the hearing to address only the factual

25   dispute as to whether the attorney had advised Sodhi about the immigration consequences of his

26   plea, never did Sodhi seek to amend his motion to assert other IAC claims or argue, even, that

27   other such claims were encompassed, somehow, in his motion. (Docs. 91, 92) To the contrary,

28   Sodhi's counsel refused to divulge the anticipated content of his expert's testimony (Doc. 91 at 7;

Doc. 92 at 6) To the extent she provided any insight into the experts' testimony, she suggested that it would be relevant only to *Strickland's* prejudice prong or the standard of care governing the way Mr. Bacon advised Sodhi of the immigration consequences. (Doc. 83 at 2-3) Indeed, at one hearing to determine whether Sodhi was required to disclose the expected nature of his expert's testimony, Sodhi's attorney stated,

> Among other things, since the dispute entails, at least partly, what counsel did or didn't advise the defendant, that, in turn, is going to beg the question of what is a meaningful advisement and how to analyze the advisement versus admitted advisements in the eyes of the experts. And that is why experts -- Mr. Sodhi's proposed expert witnesses are relevant and he is entitled to present them.
>
> And he is entitled to refrain from revealing the substance of those testimonies until after he has a chance to question trial counsel Dan Bacon, especially concerning the substance of Mr. Bacon's declaration, which as yet there's been no confrontation. There's been no opportunity to confront Mr. Bacon about this declaration. And that has to happen first before the substance of any proposed expert testimony is revealed.

(Doc. 91 at 9) The discussion continued,

> THE COURT: Is it fair to say that -- **it seems to me that if a determination is that the advisal was not given, then you don't need your experts. Is that right?**
>
> MS. FAHN: **Well, not necessarily, Your Honor. Because there's also the question of prejudice. And Mr. Sherriff still has the opportunity to -- to make a showing on that prong. And so the expert testimony could come in to that as well as the standard of care claim.**
>
> THE COURT: So you're saying that even if the factual finding is in your client's favor, one of your experts will testify -- I guess what I'm kind of stumped by is if that's the situation, isn't -- doesn't that warrant granting in his favor on its face? Or are you saying that Mr. Sherriff could somehow present evidence that would suggest that he had other information, that he already knew this, that the fact that the attorney didn't provide that to him is of no moment. I guess if that's the case, how would the experts address that except by getting into the mind of your client which they're not permitted to do?
>
> MS. FAHN: Well, as to what Mr. Sherriff would or wouldn't do, I can, I guess, speculate and we don't have that information. And so I'm simply --
>
> THE COURT: I guess I'm wondering what you think would be the counter to a finding that the advisal wasn't given. To the point where you think that your experts would be pertinent.
>
> MS. FAHN: **Well, if the advisal blatantly wasn't given and that's the finding, then the Court would then proceed to adjudicate -- well, then the Court would find that the standard of care prong has been reached. And then the Court would be obliged to then adjudicate -- well, to also -- not then, but also adjudicate the prejudice prong.**
>
> There are cases where Courts find that the defendant was not properly advised due to some breach of the standard of care but that the defendant was not prejudiced by that omission. I don't think -- the case, I submit, that there -- that the Court potentially would

be in a position to grant relief and that that might be appropriate. But I can't say for sure. Because I don't know what Mr. Farris -- Mr. Sherriff, sorry, might wish to argue or would present on the prejudice prong.

THE COURT: Well, if that's the situation, what would your -- how would your experts contribute to that determination? I mean, you know their expertise, I don't think -- I mean, I don't. I don't think Mr. Sherriff knows what they've considered. So you know whether they can contribute in that posture.

MS. FAHN: Your Honor, I really can't say without knowing what I'm speaking to.

THE COURT: Okay. Because I guess I just didn't anticipate this situation. I thought you'd say, yeah, if you don't believe Mr. Bacon, we're in, it's done, everybody goes home. So I guess there's still some question there.

But if the counter is true and the Court finds that Mr. Bacon did give the advisal that he made sure that Mr. Sodhi understood and that Mr. Sodhi is not being credible or is not credible in his statement that "I didn't know," how do your experts then contribute to the question?

MS. FAHN: **Well, it's not just the advisal, Your Honor. It's -- it's whether the advisal, whatever that advisal was or wasn't, as the Court may find, will find, whether that advisal was meaningful under the circumstances. Was it a meaningful advisement**.

THE COURT: Are you taking the position that that's not something that the Court knows without expert assistance? I mean from the --

MS. FAHN: **Particularly in view of the complexity of federal immigration law and its -- it's a whole area of expertise unto itself. The defense against immigration consequences of criminal convictions, that is a complex area and we do need an expert to assist in smoothing that out.**

**And that would be, particularly in this case, for example, the Court may have questions concerning -- well, what is the difference between the convention against torture, that is the CAT deferral, that the defendant is currently in process of litigating. And if he's successful with that, then what is the difference between that and what he's asking for or what would be the outcome of his coram nobis petition.**

**And it takes an expert in the immigration law, particularly -- not even just regular immigration law, but immigration law with criminal consequences of immigration law to speak to that. And that kind of expert is necessary to assist the Court. Yes**.

[¶¶]

THE COURT: Can I stop you right there? Ms. Fahn, you agree that that's the pleading, right? That it wasn't given as opposed to it was kind of given. Or it was given in a way that wasn't meaningful. Is that your understanding?

MS. FAHN: The way Mr. Sherriff phrased it? No, that is not my understanding. The way Your Honor just phrased it is different and that is my understanding. The latter part.

THE COURT: So you think the pleading suggests that there was some modicum of advisal, but that it wasn't sufficient. Is that right?

MS. FAHN: **Well, I don't know if it's suggests there was a modicum of advisal -- well,**

7

> **there was some discussion. I think that both -- I think the pleading does make it clear that there was some discussion of immigration consequences. And that discussion, what was the entirety of that discussion? And the pleading suggests that the entirety of that discussion was not adequate.**

(Doc. 91 at 9-13, emphasis added) Clearly, counsel understood that neither the Court nor the government interpreted the motion to suggest that it offered more than one theory of attorney incompetency. During the discussion, even Ms. Fahn did not suggest that the evidentiary hearing would concern whether there was a different plea agreement that Mr. Bacon should have sought. If Sodhi or Ms. Fahn took that position, the Court is completely stymied by their failure to seek to amend his motion or, at the very least, to alert the government of this position.

At the hearing, the Court refused to hear evidence related to claims that were not raised in the petition. Undeterred, after the Court issued its ruling, more than three years after Sodhi filed his amended motion to vacate his sentence, which found that Mr. Bacon *had* advised Sodhi of the immigration consequences of his plea, Sodhi filed additional evidence on his newly identified claim.

First, Sodhi presented the declaration of attorney Michael Mehr. (Doc. 101-1) Mr. Mehr opines that, "the weight of professional norms at the time of [Mr. Sodhi's] plea was not just that a criminal defender had an obligation to inform a client that that they "would" be deported by a plea, but it was their obligation to try to defend against these consequences by proposing an immigration neutral or safer plea." *Id.* at 4. In his opinion, Sodhi's attorney, Daniel Bacon, should have offered for Mr. Sodhi to plead guilty to "an amended count of wire fraud in violation of 18 U.S.C. § 1344 for a loss not to exceed $10,000, and the balance of loss would be based on dismissed counts or general conduct." *Id*. at 5. Mr. Mehr asserts that he has negotiated such a plea many times in state court, which provides the defendant relief from immigration consequences and provides the government full restitution. *Id*. Alternatively, Mr. Mehr asserts that Mr. Bacon could have proposed a plea to other crimes that do not constitute aggravated felonies. *Id*. at 7.

Second, Mr. Sodhi presented the declaration of attorney John Paul Balazs. (Doc. 101-2) Mr. Balazs makes similar assertions as Mr. Mehr. *Id.* at 5-6. However, Mr. Balazs, who was an Assistant United States Attorney from 1992 through 2001, reports that from between September

1    2011 through January 2013, "it was standard practice for defense attorneys to negotiate plea

2    bargains for non-citizen clients in a way that would avoid an aggravated felony conviction." *Id*. at

3    7. He fails to detail his basis for knowledge for this statement. In any event, he refers to three

4    cases. *Id*. at 8. In two, the defendants were able to obtain a plea agreement without immigration

5    consequences despite that they were charged initially with aggravated felonies. In the third case,

6    the defendant was offered such a plea but rejected it and later plead guilty to an aggravated

7    felony. *Id.* Notably, these pleas occurred in 2009, 2018 and 2010, respectively, rather than during

8    a relevant period.[4] (Doc. 104-1, Doc. 104-2, Doc. 6)

9         In the first case, Ms. Giovannini was an office manager for a medical practice who

10   admitted to embezzling $400,000 from her employer over a period of 13 months. (Doc. 104-1 at

11   14) In 2009, she plead guilty to Count 3 of the indictment, damaging to a protected computer with

12   associated loss of at least $5,000, and, in exchange, the government agreed to dismiss the other

13   counts. *Id*. at 3, 4.

14        In the second case, in 2018, Dr. Eoh plead guilty to Health Care fraud. (Doc. 104-2) The

15   factual basis for the plea described that she sought payment for preparing two workers

16   compensation medical-legal reports, which caused a loss of less than $6,000. (Doc. 104-2 at 14)

17        In the third case, Mr. Nuwintore used invalid credit cards to purchase airline tickets. (Doc.

18   104-5 at 1-2) The government offered to allow him to plead guilty to one with a loss of about

19   $1,000[5]. *Id*. at 2. Instead, Mr. Nuwintore accepted a different offer just before trial in which he

20   plead guilty to the same count and was ordered to pay $13,301,11 in restitution. (Doc. 104-6 at 2)

21        Finally, Mr. Sodhi presented discovery documents and, in doing so, implies that there may

22   have been other victims of Mr. Sodhi's fraudulent conduct who suffered not more than $10,000

23   losses. (Doc. 101-3; Doc. 101-4 at 36-37)

24   **II.    Analysis**

25        Though in Sodhi's reply she highlights the same factual allegations made in his motion

---

[4] Mr. Balazs does not detail how many cases of aggravated felonies involving people subject to removal from this country were charged by the US Attorney during the relevant period such to allow the Court to determine the percentage of these charged cases resulted in an immigration-neutral plea.

[5] In the criminal complaint, the affidavit asserted that Mr. Nuwintore cause a loss of more than $250,000. (Doc. 104-6 at 6)

1    that are recited herein (Doc. 104 at 3-4), counsel fails to explain how the allegation that Sodhi
2    would have acted differently *had* he been advised of the immigration consequences survives a
3    finding that, in fact, *he was advised* of the immigration consequences, and *he lied* when he said he
4    was not. Indeed, not only did the Court find explicitly that Mr. Bacon told Mr. Sodhi that
5    "deportation would come, basically, automatically," he also told him that the fact that he had been
6    granted political asylum in the past would not impact the immigration outcome. (Doc. 101-4 at
7    21) Mr. Bacon explained that he understood Mr. Sodhi's parents were granted political asylum in
8    the past and Sodhi received political asylum based upon the same factual basis as his parents. He
9    testified that this past grant of asylum would not mitigate the immigration consequence of the
10   plea, because he was aware that Sodhi's parents had moved back to India. He concluded that if
11   there was no danger to the parents, "where's the danger [to Sodhi]?" *Id*. at 22. He consulted an
12   immigration attorney who confirmed Mr. Bacon's understanding that the prior grant of political
13   asylum to Mr. Sodhi would not prevent his deportation. *Id*. at 22-25. He urged Sodhi to consult an
14   immigration attorney (*Id.* at 21-23) and asked him, "[if] we go to trial, and if you lose, you get
15   deported anyway and more time, or make this deal. It's up to you; what do you want to do?" *Id*. at
16   21.

17   Mr. Bacon testified that he would have liked to have been able to seek an alternate plea
18   for Mr. Sodhi and talked with him about that from the "very beginning." (Doc. 101-4 at 19). He
19   testified that Sodhi said his parents would pay the more than $2 million restitution amount. *Id*. at
20   18-19. If the restitution were paid, Mr. Bacon thought that he may have been able to negotiate a
21   plea to a crime that did not constitute an aggravated felony so avoid the immigration
22   consequences. *Id.* However, Mr. Sodhi did not pay the restitution. *Id*. Consequently, Mr. Bacon
23   testified,

> Q. Did you consider whether there might be an alternative plea to negotiate on behalf of Mr. Sodhi?
>
> A. If we had the money, I thought there might be a possibility.
>
> Q. What do you mean "if we had the money"?
>
> A. To pay restitution or a substantial part of restitution, I thought perhaps we could negotiate something else. Difficult in a federal case when the courts and the U.S. Attorney

10

require guilty pleas, not no contest pleas. So you have to be able to say that the factual basis is correct. And it's hard to go from a fraud count or theft count to something else totally unrelated when you have to give a factual basis.

Thus, Mr. Sodhi accepted the last offer that the government would extend. (Doc. 101-4 at 28-29; Hearing Ex. 8.)

> Q. Did you consider the possibility of negotiating an alternative plea that would still involve more than a year in custody, yet not be an aggravated felony?
>
> A. I can't say that I did.
>
> Q. Did you consider that to be -- did you -- I won't say "consider," but did you assume that to be completely not possible?
>
> A. I presumed it wouldn't be possible. In light of my conversations with Mr. Sherriff and his position, on a resolution, I just -- no, I didn't think it would be possible.
>
> Q. So what were those conversations with Mr. Sherriff about the resolution? What did he tell you that you remember that forms that statement?
>
> A. I remember Mr. Sherriff saying, "Dan, take it or leave it, we're set for trial in two months. This is the best you're going to get," after I negotiated it down. That -- you know, he was -- he was not real sympathetic.
> As I recall, discussions were had regarding Mr. Sodhi's prior -- not convictions, but alleged wrongdoing with the New York Stockton Exchange, and Commission of Corporations in California, those things all led up to this issue.
> There were also -- there were also discussions regarding perhaps an -- well, either it was Bobby's girlfriend took a check, or Jimmy's girlfriend took a check, money was diverted there, and maybe Bobby was involved in some way. They weren't charged, but I would -- I was never threatened, if you don't plea, they're going to charge, but there was not much sympathy for Mr. Sodhi from the government's position.

(Doc. 101-4 at 29)

The government argues that each of the victims charged in this case had losses exceeding $10,000 (Doc. 36-1 at 1) and noted that Mr. Bacon confirmed this fact in his testimony. (Doc. 101-4 at 61.) The discovery upon which Mr. Sodhi relies, demonstrates, at most, that there were other, uncharged incidents of fraud in which the other victims suffered losses of $10,000 or less. *Id*. Notably, there is no indication that Mr. Sodhi admits that the events referenced in the discovery documents constitute criminal activity or that he was willing to plead guilty to crimes involving these victims.

Mr. Balazs asserts that the policy of the US Attorney at the time of Mr. Sodhi's prosecution, was to be most concerned with the length of time the defendant would spend in prison and with obtaining full restitution for the victims and would formulate plea agreements

1    that had no immigration consequences once these objectives were met. (Doc. 101-2 at 7)
2    However, he provides no evidence of this fact. The three pleas he addresses occurred either
3    before or after the prosecution at issue. Even still, the plea offer in Mr. Nuwintore's case suggests
4    that the prosecutors were not crafting plea agreement to ensure that fraudsters could stay in the
5    country.
6         The plea offer made to Mr. Nuwintore specifically noted that he would be removed from
7    the country as a result of the conviction and made no effort to mitigate that consequence. If the
8    plea eliminated the immigration consequence, clearly, that was unknown to the AUSA. Instead,
9    the plea offer noted, ". . . the immigration consequences are potentially serious. But the
10   Defendant is likely to be deported either way—the question is how much time he will spend in
11   prison first." (Doc. 104-5 at 1-2) It seems that if prosecutors universally attempted to keep people
12   committing large-scale fraud in the country, Mr. Nuwintore would have been a deserving
13   candidate to receive this benefit. Mr. Nuwintore's father had been murdered and the defendant
14   had been beaten and imprisoned in his home country due to his and his father's political activism
15   there. (Doc. 104-6 at 2)
16        Similarly, Dr. Eoh's situation is not similar to Mr. Sodhi's: there was no evidence of any
17   past criminal activity, she refused for a significant period to accede to pressure to bill improperly,
18   and she agreed to cooperate with law enforcement in the investigation of the fraud. (Doc. 104-2 at
19   5; *See* Doc. 104-4 at 2-3. Finally, though Ms. Giovannini committed fraud over the course of 13
20   months and embezzled $400,000, there was no evidence she had committed any other crimes and
21   there was only one victim. (Doc. 104-1 at 14)
22        Mr. Sodhi, though not criminally charged, was found to have engaged in fraudulent
23   activity by the New York Stock Exchange—including stealing from his clients—and was
24   permanently barred from the Exchange as a result. Despite this and despite having been issued a
25   cease-and-desist letter from the California Department of Corporations, he continued in his
26   fraudulent and thieving activities. Mr. Sodhi's fraud was longstanding and continuous, during
27   which he flagrantly disregarded the regulatory agencies' attempts to make him stop defrauding
28   victims and the charges in this case involved nine victims within combined losses of nearly $2.5

million.

Finally, though Sodhi's counsel submitted the discovery documents described above, she fails to explain their significance. Seemingly, she implies that there were other, uncharged victims who suffered losses less than $10,001. Though the Court accepts this premise, it does not advance the issues much.[6] There evidence is that the government would *not* agree to any plea agreement other than the one Sodhi accepted. (Doc. 101-4 at 29)

To prevail on such an IAC claim in the plea-bargaining process, a movant must demonstrate that his counsel's advice was "so incorrect and so insufficient that it undermined [movant's] ability to make an intelligent decision about whether to accept the [plea] offer." *Turner v. Calderon*, 281 F.3d 851, 880 (9th Cir. 2002).  Sodhi has failed to demonstrate either deficient performance or the lack of ability to make an intelligent decision on the plea offer. Thus, the Court agrees with the government's analysis that the argument that Mr. Bacon could have secured a plea agreement with no immigration consequences is mere "wishful" thinking. Based upon the allegations of the motion and the findings the Court made previously and explains further here, the motion for reconsideration is **DENIED**.

### III.     The motion to amend must be denied.

Assuming without deciding that Rule 15 applies, the Court finds that the factors do not weigh in favor of amendment. Though under Rule 15 leave to amend a pleading should be "when justice so requires" (Fed.R.Civ.P. 15(a)), leave should not be granted where "amendment would cause prejudice to the opposing party, is sought in bad faith, is futile, or creates undue delay." *Madeja v. Olympic Packers*, 310 F.3d 628, 636 (9th Cir.2002) (citing *Yakima Indian Nation v.*

---

[6]Several of the people listed on the discovery documents were identified as victims in the attachment to the presentence report. (Doc. 36-1) For example, a 2011 police report indicates Sodhi may have defrauded Britain Elrod in the amount of $25,000. (Doc. 101-3 at 8). Likewise, despite discovery documents related to Rick Gambril, he was identified as having lost more than $1.5 million. Similarly, Elizabeth Close was identified as having lost $42,000, James Sherwood aka Elite Financial, was identified as having lost $15,000 and Kanwar Mahal was identified as having lost $27,000. (Doc. 36-1) The Court is not convinced that merely because there were incidents in which these victims paid Sodhi sums less than $10,000, that the total amounts they lost should not be considered.

Until now, there has been no suggestion that the information in the attachment to the presentence report was inaccurate. (Doc. 36-1) Indeed, each of the victims provided impact statements supporting these figures (Doc. 35-1) and Mr. Sodhi agreed to the total sum was an accurate factual basis for his plea. (Doc. 26 at 1-14)

13

1    *Wash. Dep't of Revenue*, 176 F.3d 1241, 1246 (9th Cir.1999)).

2    Again, assuming *arguendo* that Rule 15(a) applies, the Court may consider the following
3    factors in deciding whether to grant leave to amend: (1) whether the moving party has previously
4    filed an amendment, (2) whether has been undue delay, (3) whether the moving party has acted in
5    bad faith, (4) whether the amendment is futile, and (5) whether there would be prejudice to the
6    opposing party. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Loehr v. Ventura County Cmty. Coll.*
7    *Dist.*, 743 F.2d 1310, 1319 (9th Cir.1984). These factors are not of equal weight; prejudice to the
8    opposing party has long been held to be the most crucial factor in determining whether to grant
9    leave to amend. *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir.2003) ("As
10   this circuit and others have held, it is the consideration of prejudice to the opposing party that
11   carries the greatest weight"); *Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1387 (9th Cir.1990);
12   *Howey v. United States*, 481 F.2d 1187, 1190 (9th Cir.1973).

13   Considering the Rule 15 factors, the Court notes, once again, that Mr. Sodhi has amended
14   his motion one time already after having been warned of the consequence of failing to allege all
15   of his claims at that time. Based upon the analysis set forth above, it appears that Sodhi decided
16   not to seek to amend his motion earlier because he sought to obtain a tactical advantage during
17   the evidentiary hearing; this smacks of bad faith. Likewise, rather than seeking to amend in a
18   timely fashion—or, even, once his counsel was appointed and she realized that neither the Court
19   nor the government were on notice of any additional claim Sodhi wished to pursue—he delayed
20   unduly in seeking amendment. He seeks to amend now only after the Court has issued its
21   substantive order and after more than three years have passed since he filed his amended motion.

22   Also, the Court has examined the evidence that Sodhi would submit in support of this
23   amended motion and finds, as noted above, that it demonstrates only wishful thinking and
24   speculation and completely disregards that the evidence that the government refused any further
25   plea negotiations; it was a "take-it-or-leave-it" situation. Thus, the Court finds amendment would
26   be futile. Finally, because the Court has already issued its substantive order and allowing
27   amendment would require re-opening the matter on an entirely different basis, the Court finds that
28   this would be prejudicial to the government. Thus, the alternative motion to amend is **DENIED**.

### IV. Conclusion

For the reasons stated, the motion for reconsideration/motion to amend (Doc. 101) is **DENIED.**

IT IS SO ORDERED.

Dated: __December 29, 2022__　　　　　　　　　　_/s/ Jennifer L. Thurston_
　　　　　　　　　　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE